UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

CODY E. LIPP,                )
                                    )
Plaintiff,              )
                                    )
v.                         )
                                    )     Case No. 4:13-CV-4-RWS-SPM
                                    )
                                    )
CAROLYN W. COLVIN,[1]      )
Acting Commissioner of Social Security,   )
                                    )
Defendant.           )

**REPORT AND RECOMMENDATION
OF UNITED STATES MAGISTRATE JUDGE**

This is an action under 42 U.S.C. § 405(g) for judicial review of the final decision of

Defendant Carolyn W. Colvin, the Acting Commissioner of Social Security, denying the

application of Plaintiff Cody E. Lipp for Supplemental Security Income ("SSI") under Title XVI

of the Social Security Act, 42 U.S.C. §§ 1381, *et seq.* (the "Act"). This matter was referred to

the undersigned United States Magistrate Judge for review and a recommended disposition

pursuant to 28 U.S.C. § 636(b). For the reasons stated below, the undersigned recommends that

the decision of the Commissioner be reversed and the case remanded for further proceedings.

## I. PROCEDURAL HISTORY

Plaintiff received SSI benefits based on disability as a child because of his hearing loss

and Attention Deficit Hyperactivity Disorder (ADHD). In October 2010, after Plaintiff turned

18, the agency reevaluated his eligibility for SSI under the adult standard and issued Plaintiff a

---

[1] Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013.
Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Carolyn W. Colvin should
therefore be substituted for Michael J. Astrue as the defendant in this case.

Cessation of Disability Benefits for SSI under Title XVI of the Social Security Act. (Tr. 49-53). This determination was upheld at the reconsideration stage on June 6, 2011. (Tr. 84-92). On June 17, 2011, Plaintiff filed a Request for Hearing by Administrative Law Judge (ALJ). (Tr. 93-96). Following a hearing held on October 13, 2011, the ALJ issued an unfavorable decision on October 27, 2011, finding that Plaintiff's disability ended on October 15, 2010, and that he had not been disabled since that date. (Tr. 8-17). Plaintiff filed a Request for Review of Hearing Decision with the Social Security Administration's Appeals Council on December 14, 2011, but the Council declined to review the case on November 1, 2012. (Tr.1-4). Plaintiff has exhausted all administrative remedies, and the decision of the ALJ stands as the final decision of the Commissioner of the Social Security Administration.

## II.     FACTUAL BACKGROUND

### A. BACKGROUND

Plaintiff was born on September 17, 1992. (Tr. 49). He was born with a congenital hearing impairment, and he received SSI benefits as a child based on attention deficit hyperactivity disorder (ADHD) and his hearing impairment. (Tr. 10, 13, 49-53).

On October 13, 2011, Plaintiff appeared at a hearing before the ALJ to testify regarding the redetermination of his benefits using the adult standard. (Tr. 23-48). Plaintiff was 18 years old at the time of the hearing and had graduated from high school. (Tr. 25-26). Plaintiff reported that he was looking for part-time employment as a cafeteria server, cashier, or greeter. (Tr. 27-28). Until about three months before the hearing, Plaintiff had a lawn-care business in his neighborhood; his aunt took it over. (Tr. 28). Plaintiff stated that he helps out around the house by mowing the lawn, watching the kids, and preparing simple meals. (Tr. 35-36).

Plaintiff stated that he is almost completely deaf in his left ear and gets ear infections in his right ear about every month that make it difficult to hear. Plaintiff stated that he reads lips to help him understand people. Plaintiff reported that Dr. John F. Eisenbeis treats him for his ear infections by cleaning the ears out every one to three months and giving him medicine. (Tr. 31). Plaintiff testified that he hears better when his ears are cleaned out and stated that if his ear is cleaned, he can "hear well at his highest hearing level." (Tr. 31, 35). However, at other times, it is "really hard to hear" because he gets infections. (Tr. 35). Plaintiff confirmed that he forgets to take his eardrops every two days or so. (Tr. 37-39). He also stated that he does not wear a hearing aid and has refused an alternative hearing treatment as well. (Tr. 38).

Plaintiff's ADHD affects his mood, and he has problems with people sometimes, including a tendency to overreact, to be shy, or to disagree with family members. (Tr. 33-34). His mood is better when he takes his medication, but sometimes he forgets to take his medication. (Tr. 33). Plaintiff has a tendency to get off-track and has trouble concentrating. (Tr. 34).

Plaintiff also reported seeing Dr. Datta, a psychiatrist, every three months for medication to treat his ADHD. (Tr. 32).

## B. MEDICAL RECORDS

### 1. EARLY CHILDHOOD MEDICAL RECORDS (THROUGH 2002)

Plaintiff has bilateral congenital aural atresia, a condition in which an individual lacks a fully developed ear canal, eardrum, and middle ear space.[2] The record indicates that before the age of 10, Plaintiff underwent multiple surgeries related to the condition. (Tr. 344-52, 358). These included a cochlear implant; multiple microtia reconstructions in 2000 and 2001; a left ear

---

[2] *See* University of Virginia School of Medicine, "What is Atresia," http://www.medicine.virginia.edu/clinical/departments/otolaryngology/atresia/Atresia-page/.

canaloplasty and meatoplasty, and left tympanoplasty, and left cartilage graft ossiculoplasty in 2002. (Tr. 344-52, 358). In 1998, it was noted that he was able to communicate aurally, but a hearing test demonstrated marked conductive hearing loss. (Tr. 363). An audiology report from August 2002 showed that in the right ear, he had "moderate conductive hearing loss" and that in the left ear, he had "borderline normal" hearing at certain frequencies and "moderate loss" at other frequencies. (Tr. 353).

Plaintiff's childhood medical records also indicate that he "has had marked problems with behavior and hyperactivity since [he was] a toddler." (Tr. 355-57). In 2000, when he was seven and a half years old, it was noted that he was being treated by a psychiatrist and was taking several medications to manage some of his violent and aggressive tendencies. (Tr. 355).

### 2. RECORDS OF DR. GUATAM DATTA, M.D. (2008 – 2010)

On approximately twelve occasions between March 2008 and July 2010, Plaintiff saw Dr. Guatam Datta, M.D., at CenterPointe Hospital for treatment of ADHD. Plaintiff took medications during this time that included Strattera,[3] Tenex,[4] Risperdal,[5] and trazodone;[6] he was generally described as medication compliant. Dr. Datta generally reported Plaintiff's mental status to be coherent/logical, with normal mood, clear consciousness, fair memory, average intellect, and fair insight and judgment. (Tr. 379-88, 463-64, 533-34).

---

[3] Strattera is a brand name for atomoxetine. It is used to increase the ability to attention and decrease impulsiveness and hyperactivity in children and adults with ADHD. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a603013.html.

[4] Tenex is a brand name for guanfacine. It is used to control symptoms of ADHD. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a601059.html.

[5] Risperdal is a brand name for risperidone. It is used to treat several conditions, including schizophrenia, and mania. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a694015.html.

[6] Trazodone is used to treat depression. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a681038.html.

At Plaintiff's initial visit in March 2008, he was assigned a GAF score of ">60."[7]  (Tr. 388).  On April 21, 2008, Plaintiff stated that he was tired, mad, and frustrated, but that school was "good."  (Tr. 385).  On September 8, 2008, Plaintiff stated, "I'm fine—I got an attitude" and "I get mad—they ask stupid questions."  He stated that he did not like his meds.  (Tr. 383).  On September 15, 2008, Plaintiff reported that "nothing is going on" and denied complaints.  (Tr. 384).  On December 8, 2008, Plaintiff stated that things were "ok" but there was "a lot of arguing" with his sister.  (Tr. 382).  He reported that he was on the honor roll and was sleeping well, and he denied any complaints.  On March 2, 2009, Plaintiff stated, "I'm doing good," stated that school was good, and again denied any complaints.  (Tr. 381).  On December 7, 2009, Plaintiff stated, "I am doing good."  (Tr. 380).  On July 26, 2010, Plaintiff stated, "I'm doing good" and denied any concerns.  (Tr. 379).

On October 15, 2010, Plaintiff reported that he was "doing good" and expressed his desire to attend community college.  (Tr. 464).  On January 17, 2011, Plaintiff reported recent injuries and deaths among family members.  (Tr. 463).  On April 2, 2011, Plaintiff reported that he was trying to apply for jobs and had filled out 20 applications; his mood was irritable and his insight/judgment was poor.  (Tr. 533).  On November 11, 2011, Plaintiff again stated that he was "doing good" and denied any complaints.  (Tr. 534).

---

[7] The Global Assessment of Functioning Scale (GAF) is a psychological assessment tool wherein an examiner is to "[c]onsider psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness"; it does "not include impairment in functioning due to physical (or environmental) limitations."  *Diagnostic and Statistical Manual of Mental Disorders (DSM-IV)*, 32 (4th ed. 1994).  A GAF score of 61-70 indicates "[s]ome mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships."  *DSM-IV* 32.

### 3. RECORDS OF DR. FRADI SPILBERG, M.D. (2008-2010)

Between June 2008 and September 2010, Plaintiff saw Fradi Spilberg, M.D., approximately eleven times for treatment of his ADHD. (Tr. 405, 495-506). Plaintiff often reported various family problems, including difficulty getting along with family members. (Tr. 497-501, 502-506). However, he reported in 2008 that he was on the honor roll and had a great rapport with his teachers. (Tr. 502). He also reported in September 2010 that he was "doing ok" but had difficulty paying attention. (Tr. 495). These records indicate that Plaintiff was taking Strattera, Tenex, and trazodone. (Tr. 495-506). Mental status examinations during this time period indicate that Plaintiff's insight/judgment was fair to poor and his affect/mood was typically euthymic but sometimes angry or peculiar. He was generally cooperative. (Tr. 495-506).

On September 13, 2010, Dr. Spilberg answered "yes" on a form asking whether Plaintiff was able to hear and understand normal conversational speech. Dr. Spilberg also stated that Plaintiff had "anger problems" and "low frustration tolerance." (Tr. 405).

### 4. RECORDS OF ST. JOHN'S MERCY MEDICAL CENTER AND DR. JOHN F. EISENBEIS, M.D. (2007-2011)

On February 22, 2007, an audiologist at St. John's Mercy Medical Center reported that Plaintiff had "borderline mild sloping to severe conductive hearing loss" in the right ear and "severe rising to moderately severe conductive hearing" in the left hear. (Tr. 433).

Between September 2009 and August 2011, Plaintiff saw Dr. John F. Eisenbeis, M.D., regularly for treatment of his congenital aural atresia. (Tr. 392-400, 468-71, 508-31).[8] On September 21, 2009, Plaintiff reported a draining right ear for the last week. Dr. Eisenbeis found

---

[8] Dr. Eisenbeis indicated that he had been treating Plaintiff since July 2003; however, the record does not contain all of the older treatment records. (Tr. 468).

debris in the right ear and wax and casting in the left ear.  Once the ears were cleaned, Plaintiff stated that his hearing was "dramatically better."  (Tr. 400).  Dr. Eisenbeis started Plaintiff on Bleph-10 drops.  On November 17, 2009, Dr. Eisenbeis reported that Plaintiff "has now been using drops [and] states he has been doing fine.  He hears well."  Dr. Eisenbeis noted some mild scarring and applied gentian violet.  Dr. Eisenbeis stated, "This gentleman sometime down the road is going to need another repeat audiogram to see if he has any worsening of conductive hearing loss and then potentially make a treatment recommendation."  (Tr. 399).  On January 18, 2010, Dr. Eisenbeis noted some hypertrophy in the right ear and some debris in the left ear; the doctor cleaned out the right ear and gave Plaintiff some antibiotic drops for it.  (Tr. 398).

On February 18, 2010, Plaintiff had an audiogram.  (Tr. 397, 432, 493).  The audiogram record stated that Plaintiff had "mild to moderately-severe" conductive hearing loss in the right ear and "moderate to severe" conductive hearing loss in the left ear.  (Tr. 432).  Dr. Eisenbeis noted that "[h]is hearing has shown a maximum conductive loss on the left" and that "[o]n the right side, he has a 15 dB to 20 dB air-bone gap."  This represented no change from two years earlier.  Dr. Eisenbeis recommended that Plaintiff undergo a BAHA [bone anchored hearing aid], but Plaintiff was "very reluctant."  (Tr. 397).

On March 25, 2010, Dr. Eisenbeis again cleaned out Plaintiff's right ear and applied gentian violet.  (Tr. 396).  On May 21, 2010, Dr. Eisenbeis again cleaned out Plaintiff's ears.  (Tr. 395).  On August 16, 2010, Dr. Eisenbeis cleaned out Plaintiff's right ear and removed some granulation tissue.  He noted that Plaintiff "may need a revision mastoidectomy if we cannot get this to calm down."  (Tr. 394).  On August 26, 2010, Dr. Eisenbeis stated that he had put in a Merocel sponge to deliver drops to the right mastoid, that it "worked quite well," that Plaintiff's "hearing has dramatically improved," that "[t]he edema and swelling on the right mastoid bowl

has completely resolved now," and that "overall he feels quite good and is hearing well." (Tr. 392). On October 14, 2010, Dr. Eisenbeis noted that Plaintiff had some drainage out of the right ear but had "not had much problems recently." (Tr. 470). Dr. Eisenbeis removed some debris and cleaned out both ears. (Tr. 470). On January 13, 2011, Dr. Eisenbeis noted that Plaintiff's right ear did not have any drainage and that Plaintiff was "doing fine." (Tr. 469). On March 6, 2011, Dr. Eisenbeis cleaned out both ears, and Plaintiff stated that his hearing was much better. (Tr. 530).

On May 5, 2011, Dr. Eisenbeis noted that Plaintiff would be an excellent candidate for a bone-anchored hearing aid but that Plaintiff refused to have one; he noted that Plaintiff also refused to wear a hearing aid. Dr. Eisenbeis cleaned out Plaintiff's ear and stated that Plaintiff "feels like he is able to hear better." He stated that Plaintiff would continue with routine ear maintenance and that he would do better in the long term with another hearing alternative but was resistant. He stated, "This young man does quite well given his moderate hearing deficit and his need for auricular reconstruction." (Tr. 511).

On June 28, 2011, Dr. Eisenbeis noted that a fistula in Plaintiff's right ear "has been successful in providing adequate hearing" but that recently Plaintiff had felt like he had decreased hearing in the right ear and had not been able to get drops in. Dr. Eisenbeis observed significant scarring in the right ear and attempted to remove it but "was unsuccessful in completely reestablishing normal hearing." He recommended a CT scan and mastoidectomy. (Tr. 517).

In July 2011, it was noted that there was thick granular tissue on the undersurface of the skin. Dr. Eisenbeis was able to debride the chronic thickened tissue. It was noted that Plaintiff

had "conductive hearing loss" and "right chronic mastoiditis." The mastoid bowl was cleaned in the office and Plaintiff stated that his hearing had "dramatically improved." (Tr. 523).

On August 4, 2011, Plaintiff reported that his hearing was "dramatically better." Dr. Eisenbeis noted that Plaintiff would benefit from a revision left external canaloplasty and from a BAHA, but Plaintiff was not interested in either at the time. (Tr. 528).

## C. EDUCATIONAL AND VOCATIONAL RECORDS

The record contains Plaintiff's educational records from 1998 through 2011, when he graduated from high school. (Tr. 283-320, 207-239, 325-335, 437-61). The undersigned focuses on the most recent records.

On December 3, 2009, Plaintiff's school conducted a data review assessing Plaintiff's functioning and needs in several areas. (Tr. 227-39). In the section addressing Plaintiff's hearing, it was noted that Plaintiff "has difficulty hearing in group settings" and "misses information." It was also noted that "[b]ackground noise can be a concern" and that Plaintiff reads lips. (Tr. 228). The evaluation also noted that Plaintiff's teachers agreed that Plaintiff was often unmotivated to do his work and that there were issues with lack of concentration, distractions, organization, and work completion. (Tr. 229). It was also noted that Plaintiff got along well with other students, liked school, had good attendance, was very friendly with students and staff members, was polite, and was a hard worker. (Tr. 232).

On September 9, 2010, when Plaintiff was in the twelfth grade, Plaintiff's teacher filled out a teacher questionnaire. (Tr. 208-15). The teacher reported that Plaintiff had "serious problems" (four on a scale of one to five) comprehending and/or following oral instructions and understanding and participating in class discussions. (Tr. 209). She also stated that he had "obvious problems" (three on a scale of one to five) in various other areas, including learning

new material, understanding written material, writing, focusing long enough to finish tasks, and completing assignments. (Tr. 209-10). The teacher found only slight or no problems in his ability to interact and relate to others. (Tr. 211). The teacher noted that Plaintiff received modified tests and workload, received special education setting classes, and also had classes with regular education teachers. (Tr. 209).

In 2010, Plaintiff participated in a vocational rehabilitation program. (Tr. 425-36). Counselor Lydia Mitchell reported that Plaintiff's primary disability was cognitive impairments due to ADHD, and his secondary disability was hearing loss due to a congenital condition. Ms. Mitchell found Plaintiff had limitations in expressive and receptive communication, using the English language, and using telecommunication devices. She also found that he had low self-esteem, low tolerance to stress/frustration, poor concentration, poor task focus, poor interpersonal social/problem solving skills, difficulty with following directions, misunderstanding information or cues, and limited insight into own behavior, and that he was easily distracted. (Tr. 426). Ms. Mitchell classified Plaintiff as having a "Significant Disability" (Priority Category II) and found limitations in Plaintiff's functional capacity to communicate and to self-direct. (Tr. 428-30).

On May 28, 2011, Plaintiff graduated from high school with a 2.77 GPA, with no record of discipline problems. (Tr. 324-35).

### D. OPINION EVIDENCE AND CONSULTATIVE EXAMINATIONS

#### 1. CASE ANALYSIS BY DR. ISABEL MORA, M.D. (OCTOBER 2010)

On October 14, 2010, Dr. Isabel Mora, M.D., reviewed Plaintiff's medical records at the request of the state agency as part of the redetermination of whether Plaintiff was disabled at age

18. After reviewing Dr. Eisenbeis's and Dr. Spilberg's records, Dr. Mora found that Plaintiff's hearing loss was non-severe. (Tr. 407).

### 2. PHYSICAL RESIDUAL FUNCTIONAL CAPACITY ASSESSMENT OF DR. PAUL SPENCE, M.D. (MARCH 2011)

On March 23, 2011, Dr. Paul Spence, M.D., completed a physical residual functional capacity form. (Tr. 472-77). He found no exertional, postural, manipulative, or visual limitations. (Tr. 473-74). After reviewing Dr. Eisenbeis's records and audiogram results, Dr. Spence found that Plaintiff had "limited" hearing ability. (Tr. 475).

### 3. PSYCHIATRIC REVIEW TECHNIQUE FORM AND MENTAL RESIDUAL FUNCTIONAL CAPACITY ASSESSMENT OF AINE KRESHECK, PH.D. (OCTOBER 2010)

On October 18, 2010, Aine Kresheck, Ph.D., reviewed Plaintiff's medical and educational records and completed a Psychiatric Review Technique Form. (Tr. 408-19). Dr. Kresheck found that Plaintiff had a medically determinable impairment of ADHD and had IQs in the borderline intellectual functioning range during childhood. (Tr. 409). Dr. Kresheck opined that Plaintiff had moderate limitations in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, or pace; mild restriction in activities of daily living; and no repeated episodes of decompensation of extended duration. (Tr. 416). Dr. Kresheck concluded that that Plaintiff "would have some limitations due to ADHD and IQs in the BIF range, but would retain the ability to complete[] simple tasks w/limited social contact." (Tr. 418).

Dr. Kresheck also completed a Mental Residual Functional Capacity Assessment for Plaintiff. (Tr. 420-22). Dr. Kresheck opined that Plaintiff would have moderate limitations in the ability to understand and remember detailed instructions; carry out detailed instructions; maintain attention and concentration for extended periods; perform activities within a schedule,

maintain regular attendance, and be punctual within customary tolerances; work in coordination with or proximity to others without being distracted by them; complete a normal workday and workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number of rest periods; get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and respond appropriately to changes in the work setting. (Tr. 420-21). She stated that Plaintiff "retains the ability to perform tasks that are at least simple with 1-2 steps w/limited social contact." (Tr. 422).

### 4. PSYCHIATRIC REVIEW TECHNIQUE FORM AND MENTAL RESIDUAL FUNCTIONAL CAPACITY ASSESSMENT OF ROBERT COTTONE, PH.D. (MARCH 28, 2011)

On March 28, 2011, Robert Cottone, Ph.D., reviewed Plaintiff's medical and educational records and completed a Psychiatric Review Technique form. (Tr. 478-489). Dr. Cottone found that Plaintiff had ADHD, a history of borderline intellectual functioning, and a history of oppositional defiant disorder; however, the impairments did not satisfy the diagnostic criteria for a Listing. (Tr. 479-83). Dr. Cottone found that Plaintiff has mild limitations in activities of daily living; mild limitations in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, or pace; and no episodes of decompensation. (Tr. 486-87).

On the same day, Dr. Cottone completed a Mental Residual Functional Capacity Assessment form. (Tr. 490-92). Dr. Cottone opined that Plaintiff had marked limitations in the ability to understand and remember detailed instructions and the ability to carry out detailed instructions; moderate limitations in the ability to maintain attention and concentration for extended periods, to work in coordination with or proximity to others without being distracted by them, to complete a normal workday and workweek and perform at a consistent pace, to get along with coworkers or peers without distracting them, to respond appropriately to changes in the work setting, and to set realistic goals or make plans independently. (Tr. 490-91). He found

no significant limitations in the other areas assessed. (Tr. 490-91). Dr. Cottone concluded that Plaintiff could understand, remember, carry out and persist at simple tasks; make simple work-related judgments; relate adequately to co-workers or supervisors; and adjust adequately to ordinary changes in work routine or setting. (Tr. 492).

### E. TESTIMONY OF THE VOCATIONAL EXPERT

Vocational Expert (VE) Dr. Belchick testified before the ALJ on October 13, 2011. (Tr. 39-47). With respect to Plaintiff's past work, the VE stated that there was no substantial, gainful activity mentioned in Plaintiff's history record except lawn care, which was characterized as an unskilled job, *Dictionary of Occupational Titles* (*DOT*) code 408.684-010, with an SVP of 1 and 2 and a medium exertional level. (Tr. 40-41).

In the first hypothetical, the ALJ asked the VE to consider an individual with the same educational background, vocational profile, and residual functional capacity as Plaintiff who could do work at the medium exertional level, who was limited to unskilled work, and who should not perform work that includes more than infrequent handling of customer complaints. (Tr. 41). The vocational expert testified that a claimant with the limitations included in the ALJ's hypothetical could perform the lawn care work described previously and could also perform medium, unskilled work as a server (*DOT* code 311.167-018, medium, SVP 2, 1,300 jobs in the greater St. Louis area, and 350,000 in the national economy); gardener (*DOT* code 406.684-018, medium, SVP 1 and 2, about 600 jobs in greater St. Louis area, and about 120,000 in the national economy); or kitchen helper (*DOT* code 318.689-010, medium, SVP 2, 4,200 jobs in greater St. Louis area, and about 500,000 in the national economy). (Tr. 42-43).

In the second hypothetical, Plaintiff's attorney asked the VE to consider an individual of the same age, education, and work experience as Plaintiff who would be restricted from working

13

environments that include loud or dangerous machinery; who would be restricted from performing any kind of phone work; who would have no more than occasional contact with coworkers, supervisors, and the public; and who would be off task five percent of the time or two hours at a forty hour workweek. (Tr. 44-45). The VE testified that the kitchen and server jobs did not involve loud noises but that the lawn-care job would be unavailable because of the loud noises, and he said that none of the jobs involved phone work.[9] The vocational expert testified that being off task five percent of the time and two hours in the forty hour workweek would fall below the level that is generally accepted, which is typically ten percent of the time. (Tr. 45).

### III.  STANDARD FOR DETERMINING DISABILITY UNDER THE ACT

The Social Security Act defines as disabled a person who is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A); *see also Hurd v. Astrue*, 621 F.3d 734, 738 (8th Cir. 2010). The impairment must be "of such severity that [the claimant] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work." 42 U.S.C. § 1382c(a)(3)(B).

Individuals who received SSI benefits as children must have their disability redetermined using the adult standard once they reach the age of majority. *See* 42 U.S.C. § 1382c(a)(3)(H)(iii). For individuals 18 years or older, a five-step regulatory framework is used

---

[9] The VE did not specifically state whether any of the jobs he identified would be precluded by the limitation on contact with supervisors, coworkers, and the public.

to determine whether an individual claimant qualifies for disability benefits. 20 C.F.R. §§ 416.920(a); *see also McCoy v. Astrue*, 648 F.3d 605, 611 (8th Cir. 2011) (discussing the five-step process). At Step One, the ALJ determines whether the claimant is currently engaging in "substantial gainful activity"; if so, then he is not disabled. 20 C.F.R. §§ 416.920(a)(4)(i); *McCoy*, 648 F.3d at 611. At Step Two, the ALJ determines whether the claimant has a severe impairment, which is "any impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities"; if the claimant does not have a severe impairment, he is not disabled. 20 C.F.R. §§ 416.920(a)(4)(ii), 416.920(c); *McCoy*, 648 F.3d at 611. At Step Three, the ALJ evaluates whether the claimant's impairment meets or equals one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (the "listings"). 20 C.F.R. 416.920(a)(4)(iii). If the claimant has such an impairment, the Commissioner will find the claimant disabled; if not, the ALJ proceeds with the rest of the five-step process. 20 C.F.R. §§ 416.920(d); *McCoy*, 648 F.3d at 611.

Prior to Step Four, the ALJ must assess the claimant's "residual functional capacity" ("RFC"), which is "the most a claimant can do despite [his or her] limitations." *Moore v. Astrue*, 572 F.3d 520, 523 (8th Cir. 2009) (citing 20 C.F.R. § 404.1545(a)(1)); *see also* 20 C.F.R. §§ 416.920(e). At Step Four, the ALJ determines whether the claimant can return to his past relevant work, by comparing the claimant's RFC with the physical and mental demands of the claimant's past relevant work. 20 C.F.R. §§ 416.920(a)(4)(iv), 416.920(f); *McCoy*, 648 F.3d at 611. If the claimant can perform his past relevant work, he is not disabled; if the claimant cannot, the analysis proceeds to the next step. *Id.* At Step Five, the ALJ considers the claimant's RFC, age, education, and work experience to determine whether the claimant can make an adjustment to other work in the national economy; if the claimant cannot make an adjustment to

other work, the claimant will be found disabled. 20 C.F.R. §§ 416.920(a)(4)(v); *McCoy*, 648 F.3d at 611.

Through Step Four, the burden remains with the claimant to prove that he is disabled. *Moore*, 572 F.3d at 523. At Step Five, the burden shifts to the Commissioner to establish that the claimant maintains the RFC to perform a significant number of jobs within the national economy. *Id.*; *Brock v. Astrue*, 674 F.3d 1062, 1064 (8th Cir. 2012).

## IV.    DECISION OF THE ALJ

On October 27, 2011, the ALJ issued a decision finding that Plaintiff was no longer disabled as of October 15, 2010. (Tr. 8-17). The ALJ found that Plaintiff attained age 18 on September 16, 2010, and was eligible for supplemental security income as a child for the month preceding the month in which he attained age 18. At step two, the ALJ found that since October 15, 2010, Plaintiff has had the following severe impairments: aural atresia and attention deficit hyperactivity disorder. At step three, the ALJ found that since October 15, 2010, Plaintiff had not had an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 10).

The ALJ found that since October 15, 2010, Plaintiff has had the residual functional capacity to perform medium work as defined in 20 C.F.R. § 416.967(c), except that he is limited to unskilled work and should not perform work which includes more than infrequent handling of customer complaints. (Tr. 12). At step four, the ALJ found that Plaintiff had no past relevant work. (Tr. 15). However, the ALJ found that considering Plaintiff's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that Plaintiff can perform. (Tr. 16). Thus, the ALJ found that Plaintiff's

disability ended on October 15, 2010, and Plaintiff has not become disabled again since that date. (Tr. 17).

## V.    DISCUSSION

### A.  STANDARD FOR JUDICIAL REVIEW

The court's role in reviewing the Commissioner's decision is to determine whether the decision "'complies with the relevant legal requirements and is supported by substantial evidence in the record as a whole.'" *Pate-Fires v. Astrue*, 564 F.3d 935, 942 (8th Cir. 2009) (quoting *Ford v. Astrue*, 518 F.3d 979, 981 (8th Cir. 2008)). "Substantial evidence 'is less than a preponderance, but enough that a reasonable mind might accept as adequate to support a conclusion.'" *Renstrom v. Astrue*, 680 F.3d 1057, 1063 (8th Cir. 2012) (quoting *Moore v. Astrue*, 572 F.3d 520, 522 (8th Cir. 2009)). In determining whether substantial evidence supports the Commissioner's decision, the court considers both evidence that supports that decision and evidence that detracts from that decision. *Id.* However, the court "'do[es] not reweigh the evidence presented to the ALJ, and [it] defer[s] to the ALJ's determinations regarding the credibility of testimony, as long as those determinations are supported by good reasons and substantial evidence.'" *Id.* at 1064 (quoting *Gonzales v. Barnhart*, 465 F.3d 890, 894 (8th Cir. 2006)). "'If, after reviewing the record, the court finds it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the court must affirm the ALJ's decision.'" *Partee v. Astrue*, 638 F.3d 860, 863 (8th Cir. 2011) (quoting *Goff v. Barnhart*, 421 F.3d 785, 789 (8th Cir. 2005)).

### B.  THE RFC ASSESSMENT

Plaintiff first argues that the ALJ erred by failing to identify limitations in the RFC to account for Plaintiff's hearing impairment. A claimant's RFC "represents the most he can do

despite the combined effects of all of his credible limitations." *McCoy v. Astrue*, 648 F.3d 605, 614 (8th Cir. 2011). "The ALJ must assess a claimant's RFC based on all relevant, credible evidence in the record, 'including the medical records, observations of treating physicians and others, and an individual's own description of his limitations.'" *Tucker v. Barnhart,* 363 F.3d 781, 783 (8th Cir. 2004) (quoting *McKinney v. Apfel,* 228 F.3d 860, 863 (8th Cir. 2000)).

As Plaintiff argues, his hearing loss is well documented throughout the records. Plaintiff has bilateral congenital aural atresia, for which he has received multiple surgeries. (Tr. 344-52, 358)). Plaintiff testified that he is almost completely deaf in his left ear and that he gets infections in his right ear that make it difficult to hear. (Tr. 31). Plaintiff also testified that he reads lips to help him understand people. (Tr. 31). Consistent with this testimony, Plaintiff's most recent audiogram (from 2010) indicated that he had "moderate to severe" conductive hearing loss in the left ear and "mild to moderately-severe" conductive hearing loss in the right ear. (Tr. 432). Between September 2009 and August 2011, Plaintiff regularly visited his treating specialist, Dr. Eisenbeis, for infections or other conditions that affected his ability to hear and required either cleaning or other treatment. (Tr. 392-400, 468-71, 508-31). In Dr. Eisenbeis's most recent record, Dr. Eisenbeis indicated that Plaintiff would benefit from a bone-anchored hearing aid and a revision left external canaloplasty. (Tr. (Tr. 528).).

Plaintiff's school records also indicate that his hearing impairments affect his ability to function. In December 2009, it was indicated that Plaintiff "has difficulty hearing in group settings" and "misses information." (Tr. 228). It was also noted that "[b]ackground noise can be a concern" and that Plaintiff reads lips. (Tr. 228). Similarly, in September 2010, Plaintiff's teacher reported that Plaintiff had "serious problems" (four on a scale of one to five)

comprehending and/or following oral instructions and understanding and participating in class discussions. (Tr. 209).

In addition, one of the non-examining physicians to review Plaintiff's file, Dr. Spence, one of the two non-examining experts to review Plaintiff's file, found Plaintiff's hearing to be "limited." (Tr. 475).

The Commissioner argues that the ALJ accounted for Plaintiff's hearing impairment by restricting Plaintiff to infrequent handling of customer complaints. (Def's. Br., Doc. 21, at p. 9, 11, 13). It does appear from the hearing decision that, as the Commissioner suggests, the ALJ may have intended to include Plaintiff's hearing impairments as part of his RFC assessment. At step two of the analysis, the ALJ found that Plaintiff's aural atresia was a "severe impairment" and that it "significantly limit[s] the Plaintiff's ability to perform basic work activities." (Tr. 10). In addition, at the end of a paragraph in which the ALJ discussed his findings regarding Plaintiff's abilities to interact with others given his mental impairments, the ALJ stated:

> However, in giving the claimant the benefit of the doubt, and considering the fact that the state agency physical consultant, ***Dr. Spence, opined that the claimant has some hearing limitations***, the undersigned finds that the claimant should not perform work that includes more than infrequent handling of customer complaints.

(Tr. 14) (emphasis added). This statement suggests that the ALJ accepted, at least to some extent, the finding by Dr. Spence that Plaintiff had "limited" hearing ability.

However, the restriction to "infrequent handling of customer complaints" does not appear to adequately capture any hearing limitation. The ALJ did not explain how the restriction to infrequent customer complaints accommodates Plaintiff's hearing impairment, and it is not at all apparent to the undersigned that it does. As a practical matter, there is no obvious reason why someone with a ***hearing impairment*** would be restricted to handling "infrequent customer

complaints" but would otherwise have no restrictions on his ability to handle or communicate with non-complaining customers. There is also no obvious reason why someone with a hearing impairment would be restricted to "handling infrequent customer complaints" but would have no limitations in handling other matters or otherwise communicating with any other category of persons, including coworkers or supervisors. It stands to reason that Plaintiff is either unlimited in his ability to hear and communicate with customers and co-workers alike; or he is not.

Moreover, the apparent RFC finding that Plaintiff's hearing impairment limits him to "infrequent handling of customer complaints" is not supported by the medical evidence of record. Although the ALJ bears the primary responsibility for assessing a claimant's RFC based on all relevant evidence, a claimant's RFC is a medical question. *Hutsell v. Massanari,* 259 F.3d 707, 711 (8th Cir. 2001). Thus, although the ALJ is not limited to considering medical evidence, "some medical evidence 'must support the determination of the claimant's residual functional capacity.'" *Hutsell,* 259 F.3d at 712 (quoting *Lauer v. Apfel,* 245 F.3d 700, 704 (8th Cir. 2001)). Here, neither the ALJ nor the Commissioner has pointed to any medical evidence of record that would support a finding that Plaintiff is unlimited in his ability to hear, handle or communicate with non-complaining customers or co-workers; yet, as a result of his hearing impairment, is limited in his ability to handle customer complaints. The undersigned's review of the administrative record has revealed no such records. Because there is ample evidence in the record of Plaintiff's hearing limitations and because it appears that the ALJ accepted that Plaintiff had some hearing limitations, the ALJ committed reversible error by failing to adequately incorporate those limitations into the RFC.[10]

---

[10] The undersigned recommends reversal and remand even if the hearing decision can be construed as an implicit finding by the ALJ that Plaintiff had no hearing limitations, because such a finding is not supported by substantial evidence in the record a whole. Although the

This error by the ALJ was compounded when the ALJ posed a hypothetical question to the vocational expert that also failed to include Plaintiff's hearing limitations. A hypothetical question posed to the vocational expert is sufficient only "if it sets forth impairments supported by substantial evidence in the record and accepted as true by the ALJ." *Hunt v. Massanari*, 250 F.3d 622, 625 (8th Cir. 2001). While the ALJ need not use specific diagnostic or symptomatic terms in formulating the hypothetical question, the hypothetical question "must capture the concrete consequences of the claimant's deficiencies." *Id.*; *see also Swope v. Barnhart,* 436 F.3d 1023, 1025-26 (8th Cir. 2006). The failure to adequately capture the concrete consequences of a claimant's limitations in a hypothetical question to a vocational expert is grounds for remand. *See Cox v. Apfel*, 160 F.3d 1203, 1207 (8th Cir. 1998) ("If a hypothetical question does not include all of the claimant's impairments, limitations, and restrictions, or is otherwise inadequate, a vocational expert's response cannot constitute substantial evidence to support a conclusion of no disability.").

Here, even if the undersigned were to accept the Commissioner's argument that the restriction to infrequent customer complaints was somehow intended to account for Plaintiff's hearing limitations, the hypothetical question posed by ALJ to the vocational expert did not adequately capture the "concrete consequences" of Plaintiff's hearing limitations. As such, this case should be remanded for further consideration. On remand, the ALJ should reconsider the effects of Plaintiff's hearing impairment on his RFC, should make his findings and the reasons for those findings clear, and should ensure that any hypothetical questions posed to the

---

hearing decision cites some records that detract from a finding that Plaintiff has significant hearing impairments, those records do not constitute substantial evidence to support a finding of no hearing limitations, particularly in light of the lack of medical evidence supporting such a finding and the lack of explanation in the decision for such a finding.

vocational expert adequately capture the concrete consequences of Plaintiff's hearing impairment.

## C. THE WEIGHT GIVEN TO OPINION EVIDENCE

Plaintiff further argues that remand is warranted because the ALJ failed to explain in his decision the weight given to the medical opinions in the record that addressed Plaintiff's hearing impairment and mental impairments.

In making a disability determination, the ALJ shall "always consider the medical opinions in [the] case record together with the rest of the relevant evidence" in the record. 20 C.F.R. § 416.927(b); *see also Heino v. Astrue*, 578 F.3d 873, 879 (8th Cir. 2009). "Medical opinions are statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [the claimant's] impairment(s), including [the claimant's] symptoms, diagnosis and prognosis, what [the claimant] can still do despite impairment(s), and [his or her] physical or mental restrictions." 20 C.F.R. § 416.927(a)(2). "Unless a treating source's opinion is given controlling weight, the administrative law judge must explain in the decision the weight given to the opinions of a State agency medical or psychological consultant or other program physician, psychologist, or other medical specialist." 20 C.F.R. § 416.927(e)(2)(ii). However, if the medical opinions in the record are consistent with one another, the ALJ need not weigh them. *Hepp v. Astrue*, 511 F.3d 798, 806 (8th Cir. 2008).

### 1. OPINION EVIDENCE RELEVANT TO HEARING LIMITATIONS

Here, the ALJ identified several medical opinions addressing Plaintiff's ability to hear: (1) the finding of state agency consultant Paul Spence, M.D., that Plaintiff had limited hearing; (2) the finding of state agency consultant Isabel Mora, M.D., that Plaintiff's hearing loss was not severe; (3) the statement in the notes of treating specialist John Eisenbeis, M.D., that Plaintiff

"does quite well given his moderate hearing deficit and his need for auricular reconstruction";

and (4) the statement of Plaintiff's treating psychiatrist that Plaintiff could hear and understand

normal conversational speech. (Tr. 14). However, he did not discuss the weight he gave to any

of these opinions, nor is it clear from his decision or his RFC finding how he weighed the

opinions. Defendant argues that the ALJ implicitly gave significant weight to the opinion of Dr.

Spence; however, if he did so, it is unclear why the RFC did not include any hearing limitations

other than the limitation on frequent handling of customer complaints.

On remand, the ALJ should explain the weight he gives to the various opinions in the

record that relate to Plaintiff's hearing impairments.

### 2. OPINION EVIDENCE RELEVANT TO MENTAL IMPAIRMENTS

The ALJ identified several opinions concerning Plaintiff's mental functioning: (1) the

opinion of state agency consultant Dr. Kresheck, who indicated that Plaintiff had moderate

limitations in maintaining social functioning; moderate limitations in the ability to understand,

remember, and carry out detailed instructions; and no limitations with regard to simple

instructions (Tr. 420-22); (2) the opinion of state agency consultant Dr. Cottone, who indicated

that Plaintiff had mild limitations in social functioning and could relate adequately to coworkers

or supervisors; marked limitations in the ability to understand, remember, and carry out limited

instructions; and no limitations with regard to simple instructions (490-92); and (3) the statement

of Dr. Spilberg that Plaintiff had ADHD, anger problems, and low frustration tolerance. (Tr.

405).[11]

---

[11] Plaintiff also suggests that the ALJ failed to explain the weight given to the opinion of
Plaintiff's treating psychiatrist, Dr. Datta. However, although the record contains Dr. Datta's
treatment notes, Plaintiff has not pointed to any statement from Dr. Datta that would constitute
an opinion about his capabilities. The record contains a form in which Dr. Datta was apparently
asked to comment on Plaintiff's functional abilities, but it is blank. (Tr. 378). In any case, the

Although the ALJ did not expressly state the weight that he gave to any of these opinions, it appears to the undersigned that this error is likely harmless, because the weight given can be discerned from the ALJ's decision. Both Dr. Kresheck and Dr. Cottone indicated that Plaintiff would be limited in his ability to understand, remember, and carry out detailed instructions but not in his ability to understand, remember, and carry out complex instructions. After discussing these opinions, the ALJ stated that "this opinion" was consistent with the record, and he concluded that Plaintiff was capable of unskilled work. (Tr. 14). This indicates that the ALJ gave these opinions significant weight, along with the rest of the record.

The ALJ also acknowledged that both Dr. Kresheck and Dr. Cottone had opined that Plaintiff had moderate limitations in social functioning. However, he followed that acknowledgment with an explanation of why he did not find that Plaintiff had serious difficulties in social functioning, stating that the medical records did not show such difficulties and that Plaintiff's mental status examinations were generally normal. He then stated, "However, in giving the claimant the benefit of the doubt, and considering the fact that the state agency physical consultant, Dr. Spence, opined that the claimant has some hearing limitations, the undersigned finds that the claimant should not perform work that includes more than infrequent handling of customer complaints." (Tr. 14). This discussion indicates that the ALJ gave slight weight to Dr. Kresheck's and Dr. Cottone's opinions about Plaintiff's social functioning. Finally, although the ALJ did not state what "weight" he have to Dr. Spilberg's statements that Plaintiff had ADHD, anger problems, and low frustration tolerance, it appears that his finding that Plaintiff should not frequently handle customer complaints accounts for that opinion.

---

ALJ did discuss Dr. Datta's treatment notes, which mostly indicated that Plaintiff had normal mental status examinations and was functioning well. (Tr. 13).

However, because the undersigned recommends that this case be remanded for other reasons, it is not necessary to determine conclusively whether the ALJ's failure to explain the weight given to these opinions was harmless error. On remand, the ALJ should explain the weight he gave to the various medical opinions in the record, in accordance with the regulations.

### D. THE WEIGHT GIVEN TO PLAINTIFF'S EDUCATIONAL RECORDS

Finally, Plaintiff argues that the ALJ erred in failing to discuss or give weight to the opinion of Plaintiff's teachers.

A teacher is not a "medical source" but is an "other source" who may provide evidence that shows the severity of an impairment and how it affects the claimant's ability to work. *See* 20 C.F.R. § 416.913(d); Social Security Ruling ("SSR") 06-03p, 2006 WL 2329939 (Aug. 9, 2006). SSR 06-03p explains, "Although there is a distinction between what an adjudicator must consider and what the adjudicator must explain in the disability determination or decision, the adjudicator generally should explain the weight given to opinions from these 'other sources,' or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case." SSR 06-03p, 2006 WL 2329939, at *6.

The ALJ's decision contains a summary of many of Plaintiff's educational records, including a summary of some of the problems in the teacher questionnaire mentioned by Plaintiff. (Tr. 14). However, the ALJ did not "explain the weight" given to the teachers' opinions, nor did he "otherwise ensure that the discussion of the evidence . . . allows a claimant or subsequent reviewer to follow the adjudicator's reasoning." *See id*. This is particularly true with respect to Plaintiff's teachers' opinions as they relate to Plaintiff's hearing, such as his teacher's statements that Plaintiff had "serious problems" (four on a scale of one to five)

comprehending and/or following oral instructions and understanding and participating in class discussions. (Tr. 209). On remand, the ALJ should make clear his reasoning regarding the statements of Plaintiff's teachers, in accordance with SSR 06-03p.

## VI.    CONCLUSION

For the reasons set forth above, the undersigned finds that the decision of the Commissioner was not supported by substantial evidence. Accordingly,

**IT IS HEREBY RECOMMENDED** that decision of the Commissioner of Social Security be **REVERSED** and that this case be **REMANDED** under Sentence Four of 42 U.S.C. § 405(g) for reconsideration and further proceedings consistent with this Report and Recommendation.

The parties are advised that they have 14 days to file written objections to this Report and Recommendation. The failure to file timely written objections may waive the right to appeal issues of fact.

/s/Shirley Padmore Mensah
SHIRLEY PADMORE MENSAH
UNITED STATES MAGISTRATE JUDGE

Dated this 26th day of February, 2014